1
2
3
4
5

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDIN ADGUSTO CHACON, | ) 1:12-cv-00989-BAM (PC) |
| | ) |
| Plaintiff, | ) ORDER DENYING MOTION TO STAY |
| | ) THE CASE PENDING PAROLE AND |
| v. | ) RESIDENCY AS MOOT |
| | ) (ECF No. 9) |
| H. TATE, et al., | ) |
| | ) ORDER REQUIRING PLAINTIFF TO |
| Defendants. | ) EITHER FILE AMENDED COMPLAINT OR |
| | ) NOTIFY COURT OF WILLINGNESS TO |
| | ) PROCEED ONLY ON COGNIZABLE |
| | ) CLAIMS (ECF No. 7) |
| | ) |
| _____ | ) THIRTY-DAY DEADLINE |

I.      **Introduction**

        Plaintiff Edin A. Chacon is a former state prisoner proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983.  Plaintiff initiated this action on June 20, 2012, and filed a first amended complaint on November 13, 2012.  On July 26, 2013, Plaintiff filed a motion to stay the case pending his parole and residency.

II.     **Motion to Stay the Case Pending Parole and Residency**

        On July 26, 2013, Plaintiff filed the instant motion for a stay of his case until September 19, 2013.  (ECF No. 9.)  Plaintiff explained that he would parole on August 19, 2013, and would have a new residence.  However, prior to that time, he was to be transferred to Lancaster State Prison and would not have access to his personal property or legal materials until he paroled.  Plaintiff therefore requested that the Court stay this action until September 19, 2013,

approximately thirty days after he paroled, to give him sufficient time to get situated in his residence.

From the date of his request to the present, no action has been taken on Plaintiff's first amended complaint. As more than thirty days have passed since the date of Plaintiff's anticipated parole, a stay of this action is no longer necessary. Accordingly, Plaintiff's motion for stay pending his parole and residency is DENIED as moot.

### III.   Screening Order

#### A.   Screening Requirement and Standard

Plaintiff's first amended complaint, filed on November 13, 2012, is currently before the Court for screening. The Court is required to screen complaints brought by prisoners seeking relief against a governmental entity and/or against an officer or employee of a governmental entity. 28 U.S.C. § 1915A(a). Plaintiff's complaint, or any portion thereof, is subject to dismissal if it is frivolous or malicious, if it fails to state a claim upon which relief may be granted, or if it seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b)(1), (2); 28 U.S.C. § 1915(e)(2)(B)(ii).

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief. . . ." Fed. R. Civ. P. 8(a)(2). Detailed factual allegations are not required, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964-65 (2007)). While a plaintiff's allegations are taken as true, courts "are not required to indulge unwarranted inferences." Doe I v. Wal-Mart Stores, Inc., 572 F.3d 677, 681 (9th Cir. 2009) (internal quotation marks and citation omitted).

To survive screening, Plaintiff's claims must be facially plausible, which requires sufficient factual detail to allow the Court to reasonably infer that each named defendant is liable for the misconduct alleged. Iqbal, 556 U.S. at 678, 129 S.Ct. at 1949 (quotation marks omitted); Moss v. United States Secret Service, 572 F.3d 962, 969 (9th Cir. 2009). The sheer possibility

that a defendant acted unlawfully is not sufficient, and mere consistency with liability falls short of satisfying the plausibility standard. Iqbal, 556 U.S. at 678, 129 S.Ct. at 1949 (quotation marks omitted); Moss, 572 F.3d at 969.

### B.   Plaintiff's Allegations

Plaintiff is a former state prisoner.  The events alleged in his complaint occurred while Plaintiff was housed at the California Correctional Institution ("CCI") in Tehachapi, California. Plaintiff names (1) H. Tate, a primary care provider at CCI; (2) B. Grimm, a primary care provider at CCI; (3) K. Hill, a primary care provider at CCI; (4) Ka Lee, a primary care provider at CCI; (5) Le, a primary care provider at CCI; (6) Sourehnissani, a primary care provider at CCI; (7) A. Joaquin, Chief Medical Executive at CCI; and (8) S. Shiesha, Chief Physician and Surgeon at CCI as defendants.

Plaintiff alleges as follows:  On July 1, 2007, Plaintiff was treated by a primary care provider at Kern Valley State Prison for chronic pain and numbness on his wrists and hand. Following an examination, the provider prescribed pain and inflammation medication.

On January 4, 2008, Plaintiff was transferred to CCI.  His primary care provider examined him, prescribed him pain and inflammation medication and verified a chronic medical condition that needed further treatment and diagnosis by a specialist.

On May 1, 2008, Plaintiff was examined by Dr. Asala P. Jumao-as at the Kern County Neurological Medical Group.  Plaintiff was diagnosed with left median neuropathy at the wrist (carpal tunnel syndrome).  Following the diagnostic studies by Dr. Asala, Plaintiff was sent to orthopedic specialist C. Lee.  On June 26, 2008, Dr. Lee ordered an arm splint and a second consultation in two months.  Plaintiff's primary care provider at the prison agreed with Dr. Lee's orders and advised Plaintiff to use the splint indefinitely.  The provider also prescribed pain and inflammation medication.

On December 11, 2008, Plaintiff was transferred to San Quentin State Prison to attend trial.  While there, the primary care provider prescribed Neurontin for Plaintiff's carpal tunnel syndrome.  After a second meeting with the provider, the Neurontin was discontinued because it

was ineffective for carpal tunnel and likely would aggravate Plaintiff's Hepatitis C.  Instead, the provider prescribed pain and inflammation medications.

On February 24, 2009, Plaintiff returned to CCI.  On March 4, 2009, Plaintiff saw Defendant Grimm and discussed his Hepatitis C and carpal tunnel syndrome.  Defendant Grimm informed Plaintiff that he would prescribe Neurontin for the carpal tunnel.  However, Plaintiff told Defendant Grimm that the previous provider discontinued the Neurontin because it would likely aggravate his Hepatitis C and was not approved for carpal tunnel syndrome.  Plaintiff also told Defendant Grimm that the previous carpal tunnel treatment ordered by Dr. Lee, which consisted of a splint and pain and inflammation medication, was very effective and that Dr. Lee advised an injection if the pain and stiffness continued.

Defendant Grimm told Plaintiff that he was aware of the irritation and harm that Neurontin can cause to the liver, but he did not have time to look into the medical file and spend useless hours when he could just prescribe what every prisoner wants.  Plaintiff informed Defendant Grimm that he would like to refuse Neurontin, but Defendant Grimm told Plaintiff that if he refused the prescription, then he could kiss any other treatment good-bye and be written-up as a malingerer.  To avoid either the forfeiture of medical treatment or any write-ups, Plaintiff went along with the orders.  Plaintiff alleges that Defendant Grimm proceeded to prescribe the Neurontin with the knowledge that it would harm Plaintiff, that it was the wrong medication for carpal tunnel, that the previous provider had discontinued it because it would cause harm to the liver and irritate the Hepatitis C, and that there were other viable alternatives for treatment.

On April 14, 2009, Plaintiff pleaded with Defendant Grimm for an alternative to Neurontin because upon taking the medication he felt pain and weakness in his muscles and bones, had a lot of shaking and sweating of the hands and was constantly fatigued, nauseated and disconnected from reality.  Defendant Grimm denied any alternatives, told Plaintiff to take what was ordered and stated the side effects would go away.  Plaintiff asked Defendant Grimm for a list of pertinent information about the medication and its side effects.  Defendant Grimm told

Plaintiff that there was no need to provide the information because he already had informed Plaintiff that the medication could easily irritate and harm the liver and the other side effects were obvious, but it was the price that Plaintiff would have to pay.

At the next meeting with Defendant Grimm, Plaintiff reported that the side effects had not gone away and that when he took the medication he had trouble thinking straight and would get anxiety attacks.  Defendant Grimm told Plaintiff that he did not believe Plaintiff was taking the medication.  Defendant Grimm indicated that he was going to continue the Neurontin, but that Plaintiff would have to take the medication in a crushed form in front of a nurse.

On June 8, 2009, Defendant Grimm told Plaintiff his HCV was progressive and highly advised that Plaintiff start HCV treatment right away.  Plaintiff completed and signed the HCV consent and agreement forms.  Plaintiff also asked Defendant Grimm to provide the recommended alternative—splint or injections—because it was obvious that his liver was irritated from the medication.  Defendant Grimm refused and informed Plaintiff that the HCV treatment would balance out any harmful effects caused by the Neurontin.  Defendant Grimm increased the dosage of Neurontin without informing Plaintiff.  That same night, the nurse administering the medication told Plaintiff the dosage was increased to 2100 mg per day, which was four times more than first prescribed by Defendant Grimm.  The medication was administered in crushed form.

On July 28, 2009, Plaintiff underwent a liver biopsy.  The results of the biopsy showed increased inflammation and abnormality from a prior liver biopsy.  Plaintiff and Defendant Grimm discussed the results.  Plaintiff once again told Defendant Grimm that his side effects were still giving him problems.  Plaintiff asked Defendant Grimm if he would consider the specialist's orders and recommendations of a splint or injections.  Defendant Grimm told Plaintiff that he was tired of hearing complaints and if Plaintiff wanted results for his carpal tunnel or HCV, then he should ask another doctor.  Plaintiff was then assigned another primary care provider.

On October 27, 2009, Plaintiff was seen by Defendant Hill. Plaintiff told Defendant Hill that a specialist and a previous provider had ordered a splint and pain and inflammation medication, which was taken away when he returned from San Quentin. Plaintiff also told Defendant Hill that Defendant Grimm did not want to order the splint or pain and inflammation medication and instead prescribed Neurontin. Plaintiff informed Defendant Hill that a previous provider had discontinued Neurontin because it was known to aggravate the HCV and liver function and was not approved for carpal tunnel. Plaintiff also told Defendant Hill that he continued to have pain and stiffness and the Neurontin caused side effects. Plaintiff asked Defendant Hill to cancel the Neurontin prescription and instead order the splint or give him an injection.

Defendant Hill reviewed Plaintiff's medical file and confirmed the splint and injection order and the liver biopsy results. Defendant Hill checked Plaintiff's liver function panel test and informed Plaintiff that it continued to show abnormalities. Defendant Hill reported that a consultation with a HCV specialist was requested. Defendant Hill also informed Plaintiff that the Neurontins are known to cause cholestasis and irritation to the liver, which is why the panel test showed abnormalities. Defendant Hill explained that once the HCV treatment was given, then the abnormalities may go away and Neurontin was going to be prescribed. Defendant Hill believed Plaintiff required a higher dosage and prescribed Neurontin at 3300 mg per day in crushed form. Plaintiff claims that the medication continued to give him side effects.

On December 22, 2009, Plaintiff discussed his carpal tunnel and HCV with Defendant K. Lee. Defendant Lee reviewed Plaintiff's medical file, including the liver biopsy and the liver function panel. Defendant Lee told Plaintiff that he needed HCV treatment and was scheduled to see a specialist. Defendant Lee informed Plaintiff that there was a new HCV treatment that Plaintiff should take because it was better and shorter. Plaintiff told Defendant Lee that he did not want to wait too long for a new treatment on the chance that his condition would worsen. Plaintiff also said he did not want to wait because he was told by a previous provider that Neurontin was known to irritate and harm the liver. Defendant Lee told Plaintiff not to worry

because the new treatment was approved and Plaintiff was one of the first in line.  Plaintiff pleaded with Defendant Lee for an alternative treatment for his carpal tunnel, like a splint or an injection, instead of the Neurontin, which were was giving him bad side effects, including headaches, weakness and anxiety attacks.  Defendant Lee told Plaintiff that he was not going to change things and that Plaintiff was lucky to have a consultation, medication and doctor visits.  Defendant Lee also told Plaintiff that if he refused the Neurontin, then he would be refusing all treatment.  Plaintiff was afraid of losing his medication treatment and did what Defendant Lee instructed.  Plaintiff continued to suffer side effects from the Neurontin.

Plaintiff expressed his fear to his cellmate, Miguel Saenz.  Inmate Saenz told the nurse dispensing medications that Plaintiff had bad symptoms every time he took the medication.  Inmate Saenz asked if the medication could not be crushed or could be changed.  The nurse told Inmate Saenz that Plaintiff had to take the medication in crushed form in front of the nurse or be reported to the primary care physician.

On January 28, 2010, Plaintiff consulted with the specialist, Dr. Robert Protell.  Plaintiff told Dr. Protell about Defendant Lee's recommendation, but Dr. Protell was not familiar with any new, approved HCV treatment.  Dr. Protell gave Plaintiff's physician 90 days to come up with the new treatment.  Plaintiff also told Dr. Protell about the Neurontins.  Dr. Protell informed Plaintiff that too much was bad for the liver, but he could not change the treatment because he was not Plaintiff's primary physician.  Dr. Protell told Plaintiff to inform his physician that an alternative that would not damage the liver was well advised.

On February 18, 2010, Plaintiff told Defendant Lee that Dr. Protell wanted to start HCV treatment in 90 days and that Dr. Protell advised an alternative for carpal tunnel that would not damage the liver.  Defendant Lee told Plaintiff that he would have to wait for the new HCV treatment and would not be rescheduled for another consultation.  Defendant Lee refused to do anything else for Plaintiff's HCV or to give Plaintiff an alternative for carpal tunnel.

On May 24, 2010, Plaintiff met with Defendant Hill.  Plaintiff complained about the effects from the Neurontin and indicated that he would like a viable alternative, such as a splint

or injection.  Defendant Hill increased the Neurontin dosage without examining Plaintiff and without an alternative treatment.

On June 15, 2010, Plaintiff told Defendant Lee that the side effects were worsening.  He had painful swelling of his hands and feet and muscle weakness.  Plaintiff also reported that Neurontin in a crushed form was giving him anxiety, dizzy spells, twitching, trembling and trouble thinking.  Defendant Lee told Plaintiff that he was tired of his complaints and that the medicine was probably making him go crazy.  Defendant Lee refused to give Plaintiff any viable alternatives or HCV treatment.

On August 8, 2010 and September 3, 2010, Plaintiff pleaded with Defendant Lee to change his medication and to provide him HCV treatment.  Defendant Lee said that he could not believe that Plaintiff was complaining about Neurontin because other prisoners would do anything for them.

On October 4, 2010, Plaintiff told Defendant Lee that he was scared and in pain all the time.  Plaintiff asked if he could get a splint or an injection like the specialist ordered instead of Neurontin.  Defendant Lee told Plaintiff that he was not going to give him anything else.  Defendant Lee also told Plaintiff that if he refused the medication, then Defendant Lee would write Plaintiff up and Plaintiff would not get any treatment.  Plaintiff asked Defendant Lee if he would start him on the HCV treatment because he did not want to wait for the new treatment.  Defendant Lee told Plaintiff that it was going to be the new HCV treatment or none at all.

On December 8, 2010, Plaintiff was seen by Defendant Tate.  Plaintiff told Defendant Tate that previous providers had prescribed Neurontin, but the medication made him sick and he did not want to take it.  Plaintiff asked if Defendant Tate would consider an alternative, such as a splint.  Defendant Tate told Plaintiff he was upset the wrong medication was being prescribed for carpal tunnel and that Neurontins were not medically approved for carpal tunnel.  Defendant Tate also told Plaintiff that an HCV patient should never have been given such a high dosage of the medication because they were harmful to the liver.  Defendant Tate indicated he would prescribe Naproxen, but Plaintiff stated that Naproxen alone did not work.  Defendant Tate asked

Plaintiff if an injection would help.  Plaintiff reported that a splint and Naproxen together worked fine, but Defendant Tate said that it was a shot or nothing.  Plaintiff then told Defendant Tate that he was just informing him about the treatment that the orthopedist and primary physician ordered.  Defendant Tate got upset and told Plaintiff to kiss the injection and Naproxen goodbye.

On December 10, 2010, Plaintiff submitted an inmate health care appeal regarding the meeting with Defendant Tate and his refusal to treat Plaintiff for his carpal tunnel syndrome.

On December 29, 2010, Plaintiff was seen by Defendant Y. Le regarding the healthcare appeal.  Plaintiff told Defendant Le that a nurse prescribed Naproxen in response to an emergency medical request form.  Defendant Le asked Plaintiff why the Neurontins were discontinued.  Plaintiff told Defendant Le that he did not want to take the medication because it made him physically and mentally sick.  Plaintiff also told Defendant Le that Defendant Tate had agreed that Neurontins were not approved for carpal tunnel and were inappropriate for the liver. Defendant Le then told Plaintiff that she was going to discontinue the Naproxen and continue to prescribe Neurontin.  Plaintiff refused the Neurontins, but Defendant Le said that it was the only thing in the cabinet.  Plaintiff told Defendant Le that the medication gave him bad side effects and he would rather use a splint with Naproxen.  Defendant Le said a splint would be ordered, but that Plaintiff had to deal with the Neurontins.  After starting the medication again, Plaintiff began to experience the same side effects.

On February 1, 2011, Defendant Tate told Plaintiff that he did not appreciate crybabies complaining about him and that submitting appeal against him was a bad idea.  Defendant Tate then discontinued the Neurontins and told Plaintiff that he was going to stop the order for the splint.  Defendant Tate also told Plaintiff that he would have to improvise with a magazine and stop using his hand because he was not getting anything.  Defendant Tate also said that as long as Plaintiff submitted appeals and complained, then he would not get injections or HCV therapy.

On February 18, 2011, Plaintiff asked Defendant Sourehnissani for a splint, carpal tunnel medication and HCV treatment.  Defendant Sourehnissani told Plaintiff that he would prescribe Neurontin, but Plaintiff informed him that they were not approved for carpal tunnel and two

previous providers had discontinued the medication.  Defendant Sourehnissani told Plaintiff that he would have to complain to his permanent provider and that Neurontins were all that Plaintiff would receive.  Plaintiff continued to experience pain and stiffness in his hand, along with negative side effects from the Neurontins.

On March 14, 2011, Defendant Tate discontinued the Neurontins.  Defendant Tate also refused to give Plaintiff treatment for carpal tunnel or HCV.

On April 20, 2011, Plaintiff was assigned to a top bunk.  Plaintiff complained to the building guard that he fell from the top bunk because his hands gave out on him.  The guards instructed Plaintiff to contact the medical staff for renewal of a bottom bunk chrono.

On May 2, 2011, Defendant Tate refused to give Plaintiff a bottom bunk chrono.

On May 4, 2011, Plaintiff fell from the top bunk while attempting to climb it.  Plaintiff told the guards that Defendant Tate did not want to give him a bottom bunk chrono, so the guards moved Plaintiff to a bottom bunk in another cell.

On May 16, 2011, Plaintiff submitted a health care appeal regarding the wrongful administration and prescription of Neurontins.

On June 1, 2011, Plaintiff notified Defendant Tate that the prescribed Naproxen was never given to him.  Plaintiff reported pain, cramps and stiffness and requested a splint, injection or therapy for carpal tunnel.  Plaintiff also requested that Defendant Tate consider starting him on HCV treatment.  Defendant Tate told Plaintiff that he would prescribe Naproxen and that he would begin HCV treatment.

On June 7, 2011, Defendant Tate interviewed Plaintiff regarding his health care appeal. Defendant Tate told Plaintiff that he was tired of the complaints.  Defendant Tate also told Plaintiff that he was going to start the HCV treatment and refer Plaintiff to an orthopedic surgeon, but because Plaintiff would not stop with the appeals, he would not proceed with HCV treatment or order an orthopedic consultation.

Defendant Shiesha, the chief physician and surgeon, reviewed Plaintiff's appeal after the interview with Defendant Tate.  Defendant Shiesha reiterated what Defendant Tate said

regarding Plaintiff's receipt of three injections and partially granted the appeal.  Defendant Shiesha did not evaluate or review the medical file to verify Defendant Tate's statement that Plaintiff received extensive therapy, three injection and no side effects from Neurontins. Defendant A. Joaquin, the chief medical executive, reviewed Plaintiff's appeal after the second level.  Defendant Joaquin did not evaluate Plaintiff's medical file and denied the appeal.

Plaintiff did not receive HCV or carpal tunnel treatment from May 2, 2011 through February 29, 2012.  Plaintiff was seen by Defendant Tate on February 29, 2012.  Defendant Tate said that he would submit the HCV pre-treatment package, but was not going to approve it because Plaintiff had less than 18 months to complete the treatment. Defendant Tate also said that all he would give Plaintiff for carpal tunnel was Naproxen and Plaintiff should have thought about getting a visit with the orthopedist before submitting the appeal.  Plaintiff told Defendant that his parole date was August 19, 2013, and that he had enough time to complete the HCV treatment.  Defendant Tate told Plaintiff not to expect him to go out of his way for Plaintiff because of the 602 appeals.  Defendant Tate also said that by the time the paperwork was turned in, Plaintiff would not qualify for HCV treatment for lack of time.  Plaintiff confronted Defendant Tate about the three injections that were never given, but were reported in response to his appeal.  Defendant Tate admitted knowing that they were never given.

Plaintiff submitted a health care appeal regarding the meeting with Defendant Tate. Defendant K. Lee interview Plaintiff about the appeal, but refused to look into Defendant Tate's misconduct.  Defendant Lee told Plaintiff that another HCV treatment consent form could be filled out and sent to a HCV committee.  Defendant Lee did not evaluate Plaintiff's medical file and refused to give Plaintiff a splint, injection, or therapy for his carpal tunnel syndrome and refused to give him treatment for HCV.

On June 8, 2012, Defendant Lee changed the reason why Plaintiff could not receive HCV treatment and denied him treatment because of new guidelines.

Defendant Shiesha reviewed and denied the first level of appeal and Defendant Joaquin reviewed and denied the second level of appeal.

Plaintiff asserts the following claims:  (1) retaliation in violation of the First Amendment against Defendant Tate; (2) deliberate indifference to serious medical needs in violation of the Eighth Amendment against Defendants Tate, Lee, Shiesha, Joaquin, Grimm, Hill, Lee, Le and Sourehnissani; and (3) violation of his Fourteenth Amendment due process rights against Defendants Grimm, Hill, Lee, Le and Sourehnissani.  Plaintiff seeks compensatory and punitive damages.

      C.  <u>Discussion</u>

          1.  <u>First Amendment - Retaliation</u>

Plaintiff claims that Defendant Tate retaliated against him for filing medical appeals by denying him medical treatment.  Within the prison context, a viable claim of First Amendment retaliation consists of five elements: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."  <u>Rhodes v. Robinson</u>, 408 F.3d 559, 567-68 (9th Cir. 2005); accord <u>Watison v. Carter</u>, 668 F.3d 1108, 1114 (9th Cir. 2012); <u>Brodheim v. Cry</u>, 584 F.3d 1262, 1269 (9th Cir. 2009).

A plaintiff suing for retaliation under section 1983 must allege that "he was retaliated against for exercising his constitutional rights and that the retaliatory action does not advance legitimate penological goals, such as preserving institutional order and discipline."  <u>Barnett v. Centoni</u>, 31 F.3d 813, 816 (9th Cir. 1994).  The plaintiff does not need to show actual inhibited or suppressed speech, but that there was a chilling effect upon his speech.  <u>Rhodes</u>, 408 F.3d at 569.  The burden is on the plaintiff to plead and prove the absence of any legitimate correctional goals for the alleged conduct.  <u>Pratt v. Rowland</u>, 65 F.3d 802, 806 (9th Cir. 1995).

At the pleading stage, Plaintiff has stated a cognizable claim for retaliation against Defendant Tate.

///

///

2. <u>Fourteenth Amendment - Due Process</u>

Plaintiff alleges that Defendants Grimm, Hill, Lee, Le and Sourehnissani violated his substantive due process right of the Fourteenth Amendment to be free from "unjustified intrusion into the body" and "right to refuse medication."  (ECF No. 7, p. 30.)

"Where a particular amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing a plaintiff's claims." <u>Patel v. Penman</u>, 103 F.3d 868, 874 (9th Cir.1996) (citations, internal quotations, and brackets omitted), overruled on other grounds by <u>Unitherm Food Systems, Inc. v. Swift–Eckrick, Inc.</u>, 546 U.S. 394, 126 S.Ct. 980, 163 L.Ed.2d 974 (2006); <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 842, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).

Here, Plaintiff's cause of action is encompassed in his Eighth Amendment deliberate indifference claim as discussed below and "not the more generalized notion of substantive due process." <u>Patel</u>, 103 F.3d at 874.

3. <u>Eighth Amendment – Deliberate Indifference</u>

"[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" <u>Jett v. Penner</u>, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting <u>Estelle v. Gamble</u>, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976)). The two part test for deliberate indifference requires the plaintiff to show (1) "a 'serious medical need' by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain,'" and (2) the "defendant's response to the need was deliberately indifferent." <u>Jett</u>, 439 F.3d at 1096; <u>Wilhelm v. Rotman</u>, 680 F.3d 1113, 1122 (9th Cir. 2012).

Deliberate indifference is shown where the official is aware of a serious medical need and fails to adequately respond. <u>Simmons v. Navajo County, Arizona</u>, 609 F.3d 1011, 1018 (9th Cir. 2010). "Deliberate indifference is a high legal standard." <u>Simmons</u>, 609 F.3d at 1019; <u>Toguchi v.</u>

Chung, 391 F.3d 1051, 1060 (9th Cir. 2004).  Medical malpractice or negligence is insufficient to establish a constitutional deprivation under the Eighth Amendment.  Id.

Here, the Court finds that Plaintiff has stated a cognizable Eighth Amendment claim against Defendants Tate, Lee, Grimm, Hill, Le and Sourehnissani.  However, Plaintiff has failed to state a cognizable claim against Defendants Shiesha and Joaquin.

Plaintiff's claim against Defendants Shiesha and Joaquin is based on their review of his medical grievance.  The prison grievance procedure does not confer any substantive rights upon inmates and actions in reviewing appeals cannot serve as a basis for liability under section 1983. Buckley v. Barlow, 997 F.2d 494, 495 (8th Cir.1993). Accordingly, Plaintiff has not stated a cognizable claim arising out of the review of his grievances by Defendants Shiesha and Joaquin.

## III.    Conclusion and Order

Plaintiff's complaint states a cognizable claim of retaliation in violation of the First Amendment against Defendant Tate and a cognizable claim for deliberate indifference to serious medical needs in violation of the Eighth Amendment against Defendants Tate, Lee, Grimm, Hill, Le and Sourehnissani.  However, Plaintiff's complaint does not state a cognizable Fourteenth Amendment claim or a cognizable claim against Defendants Shiesha and Joaquin.

The Court will provide Plaintiff with the opportunity to file an amended complaint curing the deficiencies identified by the Court in this order.  Lopez v. Smith, 203 F.3d 1122, 1130 (9th Cir. 2000).  If Plaintiff does not wish to file an amended complaint and is agreeable to proceeding only on his cognizable claims, then Plaintiff may so notify the Court in writing.  All other claims will be dismissed.  Plaintiff will then be provided with six summonses and six USM-285 forms for completion and return.  Upon receipt of the forms, the Court will direct the United States Marshal to initiate service of process on the defendants against whom Plaintiff chooses to proceed against in this action.

If Plaintiff elects to amend, his amended complaint should be brief, Fed. R. Civ. P. 8(a), but must state what each named defendant did that led to the deprivation of Plaintiff's constitutional or other federal rights.  Iqbal, 556 U.S. at 677-78.  Although accepted as true, the

"[f]actual allegations must be [sufficient] to raise a right to relief above the speculative level . . . ." Twombly, 550 U.S. at 555 (citations omitted).  The mere possibility of misconduct is insufficient to state a claim.  Iqbal, 556 U.S. at 679.  Further, Plaintiff may not change the nature of this suit by adding new, unrelated claims in his amended complaint.  George v. Smith, 507 F.3d 605, 607 (7th Cir. 2007) (no "buckshot" complaints).

Finally, Plaintiff is advised that pursuant to Local Rule 220, the amended complaint must be "complete in itself without reference to the prior or superseded pleading."  Local Rule 220. Once an amended complaint is filed, the original complaint no longer serves any function in the case.  The amended complaint should be clearly and boldly titled "Second Amended Complaint," refer to the appropriate case number, and be an original signed under penalty of perjury.

Based on the foregoing, it is HEREBY ORDERED that:

1.      The Clerk's Office shall send Plaintiff a civil rights complaint form;

2.      Within thirty (30) days from the date of service of this order, Plaintiff must either:

        a.      File an amended complaint curing the deficiencies identified by the Court in this order, or

        b.      Notify the Court in writing that he does not wish to file an amended complaint and is willing to proceed only on his claim of retaliation in violation of the First Amendment against Defendant Tate and his claim for deliberate indifference to serious medical needs in violation of the Eighth Amendment against Defendants Tate, Lee, Grimm, Hill, Le and Sourehnissani; and

3.      If Plaintiff fails to comply with this order, this action will be dismissed for failure to obey a court order.

IT IS SO ORDERED.

Dated:   __**January 21, 2014**__          ___/s/ _Barbara A. McAuliffe_____
                                          UNITED STATES MAGISTRATE JUDGE